Weigand v. Weigand.

---

ELIZA WEIGAND

*v.*

JOHN WEIGAND.

1. Whenever a husband commits a matrimonial offence which entitles his wife to a divorce, he does that which justifies his wife in leaving him.

2. A wife is not obliged to stay under her husband's roof with his prostitute, and if she leaves his house for that reason, and he refuses to support her, she is entitled to a decree against him for alimony under the twentieth section of the statute concerning divorces.

---

On final hearing on bill and answer, and proofs taken in open court.

*Mr. M. T. Newbold*, for complainant.

Weigand *v.* Weigand.

*Mr. Theodore Ryerson,* for defendant.

VAN FLEET, V. C.

The complainant seeks a decree against her husband for alimony. Her bill is filed under the twentieth section of the statute concerning divorces. To be entitled to prevail in her suit, she must show that her husband, without justifiable cause, has abandoned her, or separated himself from her, and refused to maintain and provide for her. Both facts must be proved—both abandonment or separation, and a refusal to support. *Anshutz* v. *Anshutz, 1 C. E. Gr. 162.* It is not disputed that the defendant has refused to support the complainant. The contested question of the case is whether or not the defendant has abandoned or separated himself from his wife under such circumstances as give her a right to a decree against him.

The parties were married in 1861. They are Germans. Their married life seems to have been happy and harmonious up until the summer of 1876. In March, 1875, a female servant was brought into the family. In the summer of 1876 the wife, on her return home from the city of New York, at a time when she was not expected, discovered her husband and this servant alone in the house under circumstances which led her to suspect

---

NOTE.—The case of *Harwood* v. *Heffner, 3 Taunt. 421,* was overruled in *Descelles* v. *Kadmus, 8 Iowa, 51, 54; People* v. *Petit, 74 N. Y. 320, 325.*

If a husband introduces a prostitute into his family, his wife is justified in leaving him, and a trader who thereafter supplies her with necessaries may recover from the husband. . *Liddlow* v. *Wilmot, 2 Stark. 77; Curwen* v. *Maguire, Hay. & Jon. 178;* or where the wife leaves on account of his adultery, *Sykes* v. *Halstead, 1 Sandf. 483;* see *Cook* v. *Cook, 5 Stew. Eq. 477, note; Hair* v. *Hair, 10 Rich. Eq. 163;* but not, it seems, if he makes her a sufficient allowance, *Mizen* v. *Pick, 3 M. & W. 481.* He is also liable for necessaries furnished to her for her infant children who leave with her, *Bazeley* v. *Forder, L. R. (3 Q. B.) 559; Watkins* v. *De Armond, 89 Ind. 553;* see *Hancock* v. *Merrick, 10 Cush. 41.*

If a wife leaves her husband on just grounds, and thereafter commits adultery, a third person may recover from the husband for necessaries subsequently furnished to her, if the husband has also been guilty of adultery since the separation, *Needham* v. *Bremner, L. R. (1 C. P.) 583;* see *Govier* v. *Hancock, 6 T. R. 603; Almy* v. *Wilcox, 110 Mass. 443, 23 Alb. L. J. 284, 13 Cent. L. J. 285, 303; Fenen* v. *Moore, (N. H.) 18 Cent. L. J. 99.*—REP.

that their relations were improper. Her suspicions induced her to watch their conduct. In September, 1876, she detected them throwing kisses to each other, and she at once reproached her husband for his misconduct, when he, without a word of explanation or warning, struck her in the face with his fist with such force as to bruise her mouth and nose, loosen some of her teeth and to cause blood to flow. The wife was then in the last stages of pregnancy. Eighteen days afterwards, she was delivered of a child which died within twenty-four hours after its birth. The wife at once sent the girl away. From this time on, the conduct of the husband, according to the wife's testimony, was extremely filthy and brutal. She swears that he spit in the food which she was preparing, and that he choked her repeatedly and kicked and struck her almost every day. He made her life wretched and miserable. There can be no doubt, under the proofs, that he allowed a guilty love for this girl to take complete possession of his heart and to crowd out the love he once bore his wife. So eager did he become for the presence of this girl that he told his wife that unless she consented that the girl should return he would give her no peace. In December, 1876, the wife, after her husband gave her a very solemn promise that he would let the girl alone in the future, consented that she might return. She then came back and remained until May, 1877, when the wife again discharged her because she was living in adultery with her husband, and also because she feared that the girl and her husband intended to poison her. The wife says that, when her husband found out that she had sent the girl away, he made an oath that he would make her the unhappiest woman in the land, and that he kept his oath.

The girl was delivered of a bastard child on the 12th of February, 1878. The paternity of the child is not disputed. The husband admits that it was his. He also admits that he took the girl on a pleasure trip while she was pregnant, and that he supported her from the time she was discharged until after the birth of her child. He further admits that he was present at the birth of the child or shortly afterwards. The wife swears that her husband, on his return from the bedside of his paramour,

where he had gone, at the request of his paramour, to be present at the birth of the child, came to her bed at two o'clock in the morning and said to her, "Thank God, Anne is well; she has a little girl which is just the image of me; I am very sorry it is dead; I left $10 for its burial." She then says that she ordered him out of her room, and told him that he and she could thereafter "have nothing more to do together as husband and wife." Her testimony also shows that from the time she discharged the girl, in May, 1877, until shortly before she went to Europe, in May, 1880, the defendant continued to treat her with great cruelty. The particular acts need not be recited. They consisted both of acts of physical violence and mental torture. Besides striking and kicking her, and throwing stones and sticks at her, and pouring hot ashes down her bare back, he spoke boastingly of his love for the girl and his illicit relations with her, and at the same time taunted his wife with her incapacity to satisfy his sexual desires. When she reproached him with his infidelity he mocked her with laughter. His conduct showed, in the most unmistakable manner, that the place she once held in his heart was now occupied by another, and that instead of loving, he detested her.

The complainant went to Europe in May, 1880, with her two daughters, with the defendant's consent. Before leaving, she engaged a person to take charge of her house in her absence. In consequence of her sickness, her stay in Europe was prolonged beyond the time she intended to stay when she started, and the housekeeper she had engaged was compelled to leave the defendant's house before the complainant returned. The housekeeper remained about three months. She did not leave by the procurement of the defendant, but because her presence was necessary in her own household. Shortly after the housekeeper left, the defendant brought Anne to his house, and installed her as his housekeeper. He says he did so by the direction of his wife. His story is that his wife wrote him from Heidelberg, stating that she had heard that his housekeeper had left, and asking why he did not go and get Anne; also saying that Anne had been there before, and was a good woman to take

care of the house. The wife denies that she ever wrote anything of the kind, or that she was within four hundred miles of Heidelberg while in Europe on this occasion. The letter is not produced. The husband says his wife destroyed it, with others, after her return. This the wife also denies. There is no difficulty, however, in deciding what the truth is. The husband's story is so improbable that it would be very difficult to believe it even if it was vouched for by the oath of an impartial and credible witness. His infatuation for this girl had robbed this wife of her husband's love, and had made all the days of her future, which but for his guilty passion would, as she believed, have been full of happiness and peace, days of sorrow, wrong and humiliation. She believed that this girl had inflicted upon her the most cruel wrong it is possible for a wife to suffer, and unless it can be believed that she was endowed with a spirit of forgiveness towards her own sex rarely, if ever, exhibited before by an outraged wife, the husband's story must be rejected as unworthy of belief. But his own conduct makes it quite evident, I think, that his story is an invention. His wife did not return from Europe until the 7th of September, 1881. The girl remained with him from August or September, 1880, until the night before he expected his wife to return. He then took the girl away, together with her trunk. No reason is assigned for her going just at that time. It is not said that she was sick, or that the service was disagreeable to her, or that the work was too heavy for her, or that she had been offered a more desirable place. If she had been there with the wife's approval, it is not at all probable that she would have left just as the wife was returning, and when her services were most needed, and when she had a right to expect, if she was worthy of the commendation that the husband says his wife bestowed upon her in her letter, some acknowledgment from the wife, besides thanks for the service she had rendered during her absence. The wife has driven the girl from the house twice before. The husband says she did so because she was jealous of the girl. There was reason for both jealousy and deep indignation. The husband, by adulterous intercourse with this girl, had polluted the home of

his wife, and he took the girl away, as his wife approached his house, because he knew his wife would never enter it if she knew the girl was there.

The health of the complainant, from the time of the birth of her last child, in the fall of 1876, had been seriously impaired. She was sick and weak when she returned from Europe in September, 1881, and was soon thereafter advised by her physician that her health required her to return and take up her residence near the Black Forest. Her husband consented that she might go, and she and her two daughters sailed again for Europe on the 25th of February, 1882. On this occasion she remained away for over three years. She reached Hoboken, on her return, on the 27th of May, 1885. The defendant, immediately after his wife left, installed Anne in his house, and has kept her there constantly since, except for a few months. He says he did so at the request of his wife, or with her approval. His wife denies this, and for the reasons already given, I think his story must be rejected as untrue. The girl was still in his house when his wife returned, and also when this suit was brought. She left a few weeks after the institution of the suit, but returned again in February, 1886, and was still there when this case was tried. The complainant was informed by one of her sons, while she was in Europe, that the girl was in the defendant's house. Immediately after her return, she sent a messenger to ascertain whether she was still there, and found that she was. She was shortly afterwards informed by the defendant's mother that the girl was still there, and that she occupied the room which the complainant formerly occupied, and slept in her bed. The defendant denies that he has had sexual intercourse with the girl since the birth of her child, and he also denies all, or nearly all, of the acts of cruelty charged against him. But his denials possess very little value as evidence. The proof of his cruelty is clear and decisive. It comes, in part, from the lips of his own children. The true state of his relations with the girl is apparent. He has put his wife out of his heart, and taken this girl in. His cruelty to his wife renders it clear that the love he once bore her is turned to hate; he now loathes her presence, while his conduct shows that

he is greedy for the presence of the girl. He has had her with him whenever his wife was absent, and she has always been willing to go to him. He is a sensual man; the past illicit relations of the girl and himself have undoubtedly removed from their minds all the scruples and barriers which modesty or decency ever placed there; there can be no doubt that they each felt for the other a guilty desire, and that all they needed for its gratification was an opportunity. That they have had constantly. Unless an instance of phenomenal purity has occurred, there can be no doubt about what their relations have been. Notwithstanding the defendant's denial, the proofs leave no doubt on my mind that the defendant lived in adultery with this girl during his wife's absence, and was doing so when his wife returned, and is doing so still.

This conclusion raises the question, Did the fact that the defendant was living in adultery with this girl, in his own house, when his wife returned, constitute such an abandonment of his wife, or separation from her, as entitled her, if he refused to provide for her, to the remedy given by the statute? A husband who refuses to love and cherish his wife, and excludes her from his heart, and gives his love to another woman, and desecrates his wife's home by living there in adultery with such other woman, so completely deprives his wife of every substantial conjugal right, and so wantonly dishonors her, as to break every bond and sever every tie that ever existed between them. They are still husband and wife, but so wide apart that their separation is more effectual and unalterable than it would be if he had driven his wife from his door with blows and stripes. There may be an abandonment, within the meaning of the statute, while the parties continue under the same roof; as where the husband refuses to have any intercourse with his wife, and excludes her from that part of the house which he occupies. *Anshutz* v. *Anshutz, 1 C. E. Gr. 162.* And so, a husband is guilty of abandonment when he compels his wife, by cruel and abusive treatment, to leave him. *Starkey* v. *Starkey, 6 C. E. Gr. 135.* If, in consequence of his conduct she is compelled to leave his house, either to preserve her honor and self-respect, or to

secure safety, he is the cause of the separation, and must be adjudged to be the wrong-doer.   By the common law, if a husband turns his wife out of doors, or by cruel treatment or immoral conduct, compels her to leave him, he sends her away with his credit, and he is answerable to any person who may provide her with suitable support.   *Houliston* v. *Smythe, 3 Bing. 127 ; Emery* v. *Emery, 1 Y. & J. 501 ; Blowers* v. *Sturtevant, 4 Denio 46 ; Snover* v. *Blair, 1 Dutch. 94.*   At one time it was thought that nothing short of actual violence and terror would justify a wife in leaving her husband, and that if he brought a prostitute to his house, it was his wife's duty to remain, and if she left, she went without his credit.   *Harwood* v. *Heffner, 3 Taunt. 421.* That, however, is not the law at this day.   It would be contrary to common decency, as well as the lowest notions of morality, to compel a wife, who is a decent woman, to stay under the same roof with her husband's prostitute.   Besides, she could rarely do so without condoning her husband's offence, or at least justifying him in urging that such was the legal consequence of her conduct.   A husband who, by criminal and lewd conduct, renders his house an unfit home for his wife, should, as a matter of law, be understood to open his doors and turn her away. The present rule on this subject may be stated as follows: whenever a husband commits a matrimonial offence which entitles his wife to a divorce, either from the bond of matrimony or from bed and board, he does that which justifies his wife in leaving him.   *1 Bish. on M. & D. § 570.*   The family is the nursery of the state, and must be kept pure.

The object of the statute, under which this suit was brought, is to make the right of the wife to support more secure than it was at common law, by giving her a remedy, whenever her husband fails to perform his legal duty, directly against him, instead of leaving her right in that respect to be wrought out, as it has to be at common law, through a third person.   And, in my judgment, the statute should be construed to give a wife a right of action against her husband, whenever she separates from him under such circumstances as will enable a third person to maintain an action against him for necessaries furnished to her.   The

complainant's right to relief, both upon the facts and the law is, in my judgment, entirely clear.

The question which remains for decision is, What allowance should the complainant have? The defendant is worth at least $50,000. I think he is worth more. Both he and his brother made a very determined but clumsy effort to misrepresent his pecuniary condition, and it is not at all certain that the sum just named even fairly approximates the actual value of his property. He and his brother are engaged in business as florists, at Secaucus, in the county of Hudson. Their business has been very prosperous, and is yet. Their net annual income exceeds $10,000; it is probably over $12,000. The parties have four children, two sons and two daughters. The daughters are with their mother. The eldest son, now over twenty-one years of age, resides with his uncle, and assists him in conducting that part of the floral business which the uncle manages. The other son lives with his father. He is seventeen. The daughters should remain with their mother. Their father is unfit to be their custodian. The allowance should therefore be sufficient for the proper support of both the mother and the daughters. In such a case support should not be measured out with a stinting hand. The court can give nothing by way of punishment, but, in a case like this, where the conduct of the wife has been blameless, and that of the husband has been almost atrociously cruel, and grossly indecent, and his means are ample, it ought, in awarding alimony, to exercise a just liberality: $2,200 a year, payable quarterly, will be allowed, together with an additional counsel fee of $150. The defendant must pay the complainant's costs.